INDUSTRIAL COATINGS GROUP, INC., as Successor to Joanna Western Mills Company, Plaintiff-Appellant, v. AMERICAN MOTORISTS INSURANCE COMPANY et al., Defendants-Appellees (Transportation Insurance Company et al., Defendants).

First District (2nd Division)    No. 1—94—1491

Opinion filed December 12, 1995.

Mcbride, Baker & Coles, of Chicago (Malcolm H. Brooks, Nancy L. Pionk, and Robert S. Hirschhorn, of counsel), for appellant.

Bullaro, Carton & Stone, of Chicago (James J. Berdelle and James R. Branit, of counsel), for appellee Commercial Union Insurance Company.

Tressler, Soderstrom, Maloney & Priess, of Chicago (Michael W. Morrison, of counsel), for other appellees.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff Industrial Coatings Group, Inc. (ICG), as successor to Joanna Western Mills Co. (Joanna), appeals from a summary judgment ruling in favor of the defendant insurance companies in a declaratory judgment action involving the issue of whether there was insurance coverage for ICG's liability for pollution at a Superfund site in Griffith, Indiana, known as the American Chemical Services site (ACS site). The circuit court found that ICG gave the defendants late notice, that ICG thereby breached a condition precedent to coverage under the insurance policies, and that ICG therefore had no right to obtain coverage for the pollution claim which had been asserted against it. For reasons that follow, we affirm.

ICG is a manufacturer of window shades, industrial fabrics, and film extrusions and coatings. Prior to 1987, ICG was known as Joanna. The company is located in Chicago.

From 1959 to 1985, Joanna sent "dirty" or "spent" solvent to the ACS site in Griffith, Indiana, in order for ACS to remove the impurities. The solvents were used to clean machines in Joanna's "Art Leather" department during changes in the colors used in the fabrics produced there. As a result, the solvents would become dirty or spent with the color resins, fillers, talc, and pigments used in Joanna's processes. The impurities were removed by ACS through a distillation process, and Joanna would repurchase the recycled solvent from ACS. Joanna knew, by its course of dealings over the years, that it received only approximately 70% by volume back from ACS. The materials Joanna sent included such pollutants as methyl ethyl ketone and toluene.

Between 1965 and 1986, Joanna had purchased insurance policies from a variety of insurers, including American Motorists Insurance Co. (AMICO), Commercial Union Insurance Co. (CUICO), and Lumbermen's Mutual Casualty Co. (Lumbermen's) (collectively, the Insurers). AMICO and Lumbermen's are both part of the "Kemper Group" of insurance companies. All Kemper Group claims are handled by Lumbermen's. ICG claimed that it purchased a total of 20 policies from the Insurers, including 14 from AMICO, three from Lumbermen's, and three from CUICO. The three policies purchased from Lumbermen's were excess general liability policies; the other 17 policies were comprehensive general liability policies.

The AMICO and CUICO policies each contained the following notice provisions:

"4. Insured's Duties in the Event of Occurrence, Claim or Suit.

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the insured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative."

The policies also stated: "No action shall lie against the [insurance] companies unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy."

ACS operated several manufacturing and recycling businesses at its site from 1955 to the early 1990s. As one of those businesses, ACS recycled and reclaimed solvents from hundreds of companies. Before 1970, all solvents sent to ACS for recycling arrived at ACS in drums; after 1970, some were shipped in tank trucks. Used, dirty, or spent solvent was distilled by ACS to separate impurities from the solvent. The reclaimed solvent was then shipped in clean drums to ACS's customers. The impurities (called "still bottoms") were put in barrels or in retention ponds at the site.

Because of ACS's practices, and the practices of other companies at the site, hazardous materials were released at several locations at the site on many occasions. Drums containing hazardous substances and still bottoms leaked at several locations; over 20,000 drums containing hazardous materials, still bottoms, and other materials were buried at the site, many of which leaked or were punctured; still bottoms containing hazardous materials were pumped into reten-

tion ponds at the site; and hazardous materials were spilled at several areas at the site.

The Indiana State Board of Health made several visits to the site in the 1970s, focusing on waste handling, spill prevention, and maintenance. The United States Environmental Protection Agency (USEPA) conducted tests there in 1980, and in 1983 placed the site under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) (42 U.S.C. §§ 9601 through 9607 (1988)).

On February 19, 1986, USEPA notified Joanna that it was a potentially responsible party (PRP) under CERCLA and would be held liable for the cost of investigation and cleanup of the ACS site. USEPA stated to Joanna in this letter:

"Based on data we received during our investigation concerning the hazardous substances disposed of at this site from 1955 up until at least 1975, EPA has information that indicates that you and/or your firm may be a responsible party."

The letter went on to state: "Also, enclosed for your information is a list of PRPs who contributed waste to the site." Joanna is identified on the list as a PRP.

ICG admitted as much in its complaint:

"On or about February 19, 1986, the EPA notified ICG (as well as numerous other identified PRP's) that ICG was a contributor to, and ultimately a PRP for, the contamination occurring at the ACS Griffith Site. The EPA claim that its notice was based upon ACS's disposal of unreclaimed solvent waste originating at ICG's Chicago facility.

Upon being identified as PRPs, ICG and the other PRPs became faced with potentially debilitating liability for clean-up under CERCLA without regard to who was at fault for the contamination that occurred."

The February 19, 1986 letter requested that Joanna voluntarily participate in the cleanup of the ACS site, under the threat that if it did not do so, it could be held jointly and severally liable under CERCLA:

"Before the government undertakes necessary action at the site, we would like to know if you will voluntarily perform the work required to abate any releases or threatened releases of hazardous substances, pollutants, and contaminants from the site. You should be aware that under Section 107(a) of CERCLA, where the Agency uses public funds to achieve the cleanup of the hazardous substances, you may be liable for all costs associated with the removal or remedial action and all other necessary costs incurred in cleaning up the site, including investigation, planning and enforcement.

EPA will consider an offer from you to participate in the remedial investigations and feasibility studies (RI/FS) described above. *** Also, enclosed for your information is a list of PRPs who contributed waste to the site. You should notify EPA in writing within 30 calendar days of your willingness to conduct or participate with other potentially responsible parties in the RI/FS."

On March 6, 1986, USEPA sent a second, separate letter to Joanna which reiterated that Joanna was a PRP and that Joanna would be held responsible for the costs of cleanup at the ACS site. This letter stated:

"Recently, the United States Environmental Protection Agency (U.S. EPA) sent you a letter notifying you that U.S. EPA considers you a potentially responsible party for expenditures U.S. EPA has made or will incur in the future at the [ACS site]. *** The other deadlines in our original letter remain unchanged (specifically, the date for you to notify the U.S. EPA of your willingness to participate, and the deadline for responding to the request for information are both 30 days from the date you received the original notice letter.)"

On March 25, 1987, USEPA sent out another PRP letter and information request. This letter was sent to companies which had not received the original 1986 letter, as well as to Joanna and other PRPs which had received the original letter. After receiving this third letter, ICG notified its insurance broker, Frank B. Hall & Co., for the purpose of notifying the Insurers about the letter. The broker informed ICG that only the insurers in policies covering the period 1950-75 should be notified.

On April 28, 1987, more than 14 months after it had received USEPA's February 19, 1986, letter, ICG gave written notice to the Kemper Group, representing AMICO and Lumbermen's. According to ICG's complaint, shortly after giving this notice, and before AMICO had an opportunity to respond to the notice letter, ICG had agreed to a consent order which became effective in May 1987. This order "obligated [ICG] to perform a remedial investigation/feasibility study" at the ACS site, in concert with other PRPs. The notice letter to AMICO mentioned nothing about the consent order and mentioned nothing about the negotiations which led to the consent order. The cost to the participants was estimated at $1,550,000. ICG did not give CUICO notice until April 9, 1990.

On May 19, 1987, AMICO responded to ICG's notice. In a letter of that date, AMICO stated that it would not defend ICG because no lawsuit had been filed yet and therefore no defense obligation on its part could possibly have arisen. AMICO considered this letter as a preliminary reservation of rights which set forth AMICO's "reasons

why there was a possibility that no coverage existed." Over a year later, on July 27, 1988, AMICO specifically refused to defend or indemnify ICG in response to USEPA's claims. It repeated its refusal on October 4, 1988.

CUICO, upon receiving ICG's April 1990 written notice, referred the matter to counsel for a coverage opinion. On May 16, 1991, CUICO also refused to defend or indemnify ICG.

On August 30, 1991, ICG filed suit against the Insurers and certain other companies. Four other defendants were dismissed by agreement on January 16, 1992; October 21, 1992; June 22, 1993; and December 9, 1993. This appeal does not include those defendants.

On July 8, 1993, ICG took the deposition of Edward Albanese, the manager of the hazardous waste unit at CUICO and the person responsible for CUICO's response to ICG's claim for coverage. Albanese was deposed both personally and as CUICO's corporate representative in response to a notice pursuant to Supreme Court Rule 206(a)(1) (134 Ill. 2d R. 206(a)(1)).

In that deposition, Albanese, on advice of counsel, refused to answer questions on: (1) whether coverage counsel analyzed whether there were any excuses or reasons for notice to have been given in April 1990; (2) what prejudice CUICO suffered as a result of the delay in receiving notice; (3) what facts CUICO learned after the inception of litigation which indicated that Joanna/ICG did not give timely notice of its request for coverage; (4) what documents would help the witness recall other claims that CUICO received involving the ACS site; (5) whether CUICO had any information that ICG knew of any contamination at the ACS site before March 1987; (6) whether notice would have been timely if ICG had given notice to CUICO in 1987; and (7) whether the other reasons listed by CUICO for denying coverage in 1991 were still viable.

On August 26, 1993, ICG filed a motion to compel and a memorandum in support. On August 27, 1993, the circuit court denied the motion to compel on the ground that "[h]e's already answered the questions." When ICG protested this ruling, the court gave ICG the option of accepting a dismissal for want of diligence. The case was not dismissed.

On December 29, 1993, ICG filed an additional motion to compel that consolidated its unresolved discovery disputes regarding a deposition by an AMICO representative and AMICO's failure to produce documents in response to two requests. At a hearing on the motion on January 4, 1994, the circuit court refused to hear the second motion to compel, on the ground that it would extend the discovery cutoff.

CUICO filed a summary judgment motion on July 9, 1993. On February 14, 1994, CUICO filed a new motion for summary judgment, in conjunction with AMICO and Lumbermen's. The Insurers supported their motion with voluminous materials. ICG filed a cross-motion for summary judgment on February 16, 1994, also supporting its motion with dozens of evidentiary exhibits. The motions were heard on April 6, 1994. The circuit court ruled:

"I'm ruling solely on the basis of the question of notice. In the instant case on February 19, 1986, the Environmental Protection Agency of the United States directed a letter to ICG, which placed them in this Court's opinion applying a reasonable man's standard of an occurrence, claim or suit flowing from the use of the so-called Griffith, Indiana, site for the recycling of solvents emanating from the Joanna Mills plant and the return of portions of those solvents to the Joanna Mills plant for reuse."

The court held that there were no genuine issues of material fact, and that, as a matter of law: (a) ICG had a duty to notify both AMICO/Lumbermen's and CUICO in early 1986, following USEPA's letter; (b) ICG did not actually notify AMICO until April 1987, CUICO until April 1990, or Lumbermen's until 1991; and (c) notice was late to each of the Insurers as a matter of law. It accordingly entered summary judgment in favor of the Insurers and against ICG. In its written order, the court specifically held that it was not ruling on the choice of law of pollution exclusion issues and marked the judgment as final and appealable. ICG filed a timely notice of appeal.

# I

ICG first asserts that its notice to the Insurers was timely and that the Insurers expressly admitted that its notice raised the possibility of coverage for ICG. That admission, ICG argues, requires the Insurers as a matter of law to defend ICG. Because the Insurers failed either to defend ICG or to seek a declaration of their obligations, they are now estopped to assert any policy defense, including late notice. ICG argues that the circuit court failed properly to analyze estoppel and, as a result, erred in failing to grant ICG's motion for summary judgment. The Insurers respond that Joanna/ICG's duty to give them notice arose as soon as it knew or should have known that a claim of liability might be made against it. They argue that the USEPA letter of February 1986 triggered such a duty and that the circuit court properly found that ICG's delay in giving notice was unreasonable as a matter of law. They also argue that estoppel is inapplicable under these facts.

## A

The insurance policies at issue in this case required Joanna to give notice of an occurrence "as soon as practicable," and notice of a claim or suit "immediately." Additionally, the policies state that "no action shall lie against the [insurance] company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of [these] polic[ies]."

■ Illinois law recognizes that timely notice is not merely a technical requirement but a valid prerequisite to coverage. (*INA Insurance Co. v. City of Chicago* (1978), 62 Ill. App. 3d 80, 83, 379 N.E.2d 34, 37.) Further, such a requirement of timely notice is a condition precedent of the policy, a breach of which relieves the insurer of any duty to defend or indemnify. *American Country Insurance Co. v. Cash* (1988), 171 Ill. App. 3d 9, 11, 524 N.E.2d 1016, 1018, *appeal denied* (1988), 122 Ill. 2d 569, 530 N.E.2d 238; *Equity General Insurance Co. v. Patis* (1983), 119 Ill. App. 3d 232, 237, 456 N.E.2d 348, 352; *City of Chicago v. United States Fire Insurance Co.* (1970), 124 Ill. App. 2d 340, 348, 260 N.E.2d 276, 280.

The duty to give notice of an alleged "occurrence" arises when the insured knows or should know that a claim or lawsuit might ensue. (*United States Fidelity & Guaranty Co. v. Maren Engineering Corp.* (1980), 82 Ill. App. 3d 894, 899, 403 N.E.2d 508, 511; *Patis*, 119 Ill. App. 3d at 237, 456 N.E.2d at 352.) The duty to notify arises on the day the insured receives information regarding an alleged incident which potentially might be covered under the insurance policy. (*Fletcher v. Palos Community Consolidated School District No. 118* (1987), 164 Ill. App. 3d 921, 926, 518 N.E.2d 363, 367.) The key element of the duty to notify is the appearance to a reasonably prudent person that a claim potentially covered by the policy "may be brought against the insured and not the appearance that the insured, in fact, may be liable." (*National Bank v. Winstead Excavating* (1981), 94 Ill. App. 3d 839, 842, 419 N.E.2d 522, 524.) The test is whether any reasonably prudent person "could foresee a lawsuit" and would either contact his attorney or his liability carrier. *Twin City Fire Insurance Co. v. Old World Trading Co.* (1993), 266 Ill. App. 3d 1, 7, 639 N.E.2d 584, 588, *appeal denied* (1994), 158 Ill. 2d 584, 645 N.E.2d 1369.

ICG argues if an insured only has knowledge of a potential claim, or if an insured only believes a claim might be asserted against it, then notice is not required to be given. ICG relies upon several cases in an effort to argue this point, but in fact the cases it cites lead to exactly the opposite conclusion.

In *American Country Insurance Co. v. Efficient Construction Corp.* (1992), 225 Ill. App. 3d 177, 587 N.E.2d 1073, *appeal denied* (1992),

145 Ill. 2d 631, 596 N.E.2d 625, one of the principal cases upon which ICG relies, the court held that "[t]he key element of the requirement to notify is the appearance to a reasonable person that a claim covered by a policy may be brought against the insured and not the appearance that the insured may be liable." *American Country Insurance Co.*, 225 Ill. App. 3d at 181, 587 N.E.2d at 1075.

In *Farmers Automobile Insurance Association v. Hamilton* (1976), 64 Ill. 2d 138, 355 N.E.2d 1, another case relied upon by ICG, our supreme court similarly held:

> "It was Hamilton's duty to give timely notice to plaintiff of any occurrence of injury which would suggest to a reasonably prudent person that a claim for damages might be asserted for which coverage might be provided under his homeowner's policy." (*Hamilton*, 64 Ill. 2d at 142, 355 N.E.2d at 3.)

The court went on to hold that because the insured in that case did not know there was coverage, an issue of fact arose as to when notice was required to be given. Here, however, ICG's insurance manager testified that ICG had always believed that it had coverage for pollution liability, even before it received the 1986 USEPA letter. Further, the 1986 letter itself requested copies of ICG's liability policies, which ICG sent to USEPA within a couple of weeks. ICG admitted that when it received the 1986 letter, it knew the land at the ACS site was polluted and knew that it could be liable for cleaning it up.

In *H.H. Hall Construction Co. v. Employers Mutual Liability Insurance Co.* (1963), 43 Ill. App. 2d 62, 193 N.E.2d 51, a decision upon which ICG also relies, the appellate court held that late notice could be excused if the insured did not believe it could be liable. That holding, however, is no longer viable. The Appellate Court, Fourth District, abandoned its holding in *H.H. Hall Construction Co.* in its 1981 decision in *National Bank.* Relying upon our supreme court's holding in *Hamilton*, the fourth district squarely held that it is the appearance that a claim might be filed which triggers a notice obligation, not the appearance that the insured might be liable. *National Bank*, 94 Ill. App. 3d at 842, 419 N.E.2d at 524.

In *Barrington Consolidated High School v. American Insurance Co.* (1974), 58 Ill. 2d 278, 319 N.E.2d 25, another case relied upon by ICG, our supreme court found that the insured, a school, had not breached the notice clause of the insurance policy because, prior to the filing of a suit against the school, "there was nothing to cause the school reasonably to believe that the injury might give rise to a claim for damages." (*Barrington Consolidated High School*, 58 Ill. 2d at 282, 319 N.E.2d at 27.) Here, on the other hand, ICG's officers admitted that when they received the USEPA's 1986 letter they knew that

the ACS site was contaminated with pollution, that ICG had sent waste to the site, that ICG had been designated as a PRP in the 1986 letter, and that USEPA was threatening ICG with liability for the contamination.

Finally, in *Twin City Fire Insurance Co. v. Old World Trading Co.* (1993), 266 Ill. App. 3d 1, 639 N.E.2d 584, *appeal denied* (1994), 158 Ill. 2d 584, 645 N.E.2d 1369, the appellate court held that notice was required to be given at that point in time when the insured would either contact his attorney or his liability insurer. (*Twin City Fire Insurance Co.*, 266 Ill. App. 3d at 8, 639 N.E.2d at 588; see also *Hartford Casualty Insurance Co. v. Snyders* (1987), 153 Ill. App. 3d 1040, 506 N.E.2d 627; *National Bank*, 94 Ill. App. 3d at 842, 419 N.E.2d at 524.) Here, ICG contacted its attorneys the day after it received the February 1986 letter, and those attorneys actively represented it for 14 months before ICG gave notice to its insurance companies.

If, therefore, the February 1986 PRP letter constituted a notice of an occurrence, the duty to give notice began upon receipt of the letter if Joanna knew or should have known that the letter threatened it with potential liability.

Allegations contained in a complaint are judicial admissions and are conclusive against the pleader. (*Calloway v. Allstate Insurance Co.* (1985), 138 Ill. App. 3d 545, 549, 485 N.E.2d 1242, 1245.) An admission of an insured as to when it knew of a possible claim is an admission of fact. See *Patis*, 119 Ill. App. 3d at 237, 456 N.E.2d at 352 (insured admitted that he knew of possible claim by date of fire).

■ By its own pleading, ICG has admitted that it knew it was a PRP and that it faced liability under CERCLA the same day it received the February 1986 PRP letter. By its own pleading, ICG has also admitted that it knew that USEPA was alleging that it had caused environmental contamination at the ACS site by its shipments of solvent waste. Further, by its own pleading ICG has made a binding judicial admission that it knew it faced potential liability for a claim by USEPA for the costs of cleanup and remediation of the ACS site. By these admissions, it is clear that Joanna had a duty to give notice to its insurers upon receipt of the February 1986 PRP letter.

■ Under Illinois law, a delay of even a few months in giving notice breaches the policy as a matter of law, defeats coverage, and justifies the entry of summary judgment for the insurance company. *Patis*, 119 Ill. App. 3d at 237, 456 N.E.2d at 352; *Illinois Valley Minerals Corp. v. Royal-Globe Insurance Co.* (1979), 70 Ill. App. 3d 296, 300, 388 N.E.2d 253, 256; *Charter Oak Fire Insurance Co. v. Snyder* (1974), 22 Ill. App. 3d 350, 355, 317 N.E.2d 307, 311; *INA Insurance Co.*, 62

Ill. App. 3d at 84, 379 N.E.2d at 522; *Casualty Indemnity Exchange v. Village of Crete* (7th Cir. 1984), 731 F.2d 457, 459.

■ It is undisputed that Joanna/ICG delayed at least 14 months in notifying the Insurers that it knew of an occurrence that might lead to an assertion of its liability. As a matter of law, such a delay is unreasonable. The circuit court properly held that ICG had failed to comply with a condition precedent in its contracts with the Insurers, and the court's granting of summary judgment in favor of the Insurers and against ICG was correct. We will not disturb it.

**B**

ICG further asserts that the Insurers are estopped from raising any of their coverage defenses, including late notice, because they did not defend ICG and were not the plaintiffs in the declaratory judgment suit. The Insurers respond that estoppel is not applicable on these facts.

■ In order for estoppel to apply, the insurer must be found to have had a duty to defend, and then must be found to have breached that duty. *Charles H. Eichelkraut & Sons, Inc. v. Bituminous Casualty Corp.* (1988), 166 Ill. App. 3d 550, 553, 519 N.E.2d 1180, 1182; see also *City of Chicago v. United States Fire Insurance Co.* (1970), 124 Ill. App. 2d 340, 260 N.E.2d 276 (because notice was late, no duty to defend as a matter of law).

In *Del Grosso v. Casualty Insurance Co.* (1988), 170 Ill. App. 3d 1098, 524 N.E.2d 1042, the insured had breached the policy by giving late notice. The court rejected the idea that the insurer could be estopped from raising the late notice issue even though the insurer had not defended the underlying lawsuit or filed a declaratory judgment action against the insured.

In *M/A Com, Inc. v. Perricone* (1989), 187 Ill. App. 3d 358, 543 N.E.2d 228, the insurer denied coverage based on late notice. When suit was filed against the insured, the insurer refused to defend. A judgment was entered against the insured. The insurer argued that the policy had been breached by the insured's failure to give timely notice, but the circuit court ruled that the insurer's failure to defend the suit or file a declaratory judgment action gave rise to estoppel. The appellate court reversed, holding that the circuit court had incorrectly failed to give the insurance company opportunity to demonstrate that the insured had breached the policy by giving late notice. The court noted that estoppel applies only where a duty to defend exists and has been breached, and held that if the insurer were able to show that the insured had given late notice, the insurer would be relieved of its duty to defend and estoppel would not apply. Although

that case was a garnishment case rather than an insurance coverage case, a garnishor has no greater and no lesser rights than an insured, and the court's analysis did not depend upon the fact that the case was one of garnishment.

In *La Rotunda v. Royal Globe Insurance Co.* (1980), 87 Ill. App. 3d 446, 408 N.E.2d 928, cited by ICG for the proposition that because the Insurers refused to defend ICG and failed to file a declaratory judgment action they were estopped from raising defenses under the insurance policies, the court failed to determine whether the insurer had indeed breached its duty to defend when it precluded the insurer from establishing that such a duty to defend had been obviated by the insured's prior breach of the condition precedent of timely notice. Under the analysis provided by the court in *M/A Com*, *La Rotunda* is inapposite.

In order to avoid the doctrine of estoppel, as well, an insurer need only seek adjudication of its rights and obligations under the policy prior to or pending resolution of the underlying lawsuit; the insurer need not secure a final determination in the declaratory judgment action prior to resolution of the underlying lawsuit. (*Insurance Co. v. Markogiannakis* (1989), 188 Ill. App. 3d 643, 652, 544 N.E.2d 1082, 1087.) An insurer is not obligated to bring its own declaratory judgment action; an action brought by an insured will adjudicate the insurer's obligations just as well. *Sears, Roebuck & Co. v. Seneca Insurance Co.* (1993), 254 Ill. App. 3d 686, 694, 627 N.E.2d 173, 178.

In *Sears, Roebuck & Co.* the insured attempted to assert that the insurer was estopped from raising a late notice defense because it did not seek a declaratory judgment. In that case, as here, the insured rather than the insurer filed the declaratory judgment action but the insurer filed a motion for summary judgment on the late notice defense. This court rejected the application of estoppel because the insurer "actively sought, through a motion for summary judgment, an adjudication of its rights and duties." (254 Ill. App. 3d at 694, 627 N.E.2d at 178.) It concluded that the fact that the insured initiated the declaratory judgment action was irrelevant, and that its estoppel argument must therefore fail. *Sears, Roebuck & Co.*, 254 Ill. App. 3d at 694, 627 N.E.2d at 178; see also *Village of Melrose Park v. Nautilus Insurance Co.* (1991), 214 Ill. App. 3d 864, 867, 574 N.E.2d 198, 199 (that insured brought action is irrelevant; the declaratory judgment is of legal import, not the party initiating proceeding); *Louis Marsch, Inc. v. Pekin Insurance Co.* (1985), 140 Ill. App. 3d 1079, 1084, 491 N.E.2d 432, 435-36 (no estoppel where insurer's answer to insured's declaratory judgment complaint denied coverage and insurer consistently argued no duty to defend and no coverage); *Auto-*

*Owners Insurance Co. v. Corrie* (1981), 102 Ill. App. 3d 93, 95, 429 N.E.2d 883, 885; *Ayres v. Bituminous Insurance Co.* (1981), 100 Ill. App. 3d 33, 35 n.1, 424 N.E.2d 1316, 1318 n.1.

■ In this case, the Insurers' answers to ICG's declaratory judgment complaint denied any coverage and any duty to defend and raised late notice as one of several affirmative defenses. Additionally, as in *Sears, Roebuck & Co.*, the Insurers "actively sought, through a motion for summary judgment, an adjudication of its rights and duties." That it was ICG that filed this action is irrelevant. Under *Sears, Roebuck & Co.* and its predecessors, then, ICG's assertion of estoppel must fail.

In this case, as well, the Insurers have clearly shown that ICG gave late notice. Under Illinois law, they are therefore relieved of all coverage obligations, including the duty to defend. Estoppel does not apply, and we will not disturb the ruling of the circuit court on the basis of estoppel.

## II

ICG next asserts that genuine issues of material fact preclude the entry of summary judgment on the timeliness of Joanna/ICG's notice to the Insurers. It argues that the issue of whether notice was given at a reasonable time necessarily presents an issue of fact that must be submitted to a jury unless there is no controversy as to the facts. Here, it argues, there was clear controversy as to the facts. The Insurers respond that, in numerous cases they cite, this court and other courts have affirmed summary judgment rulings in favor of insurers on late notice defenses because in those cases, as here, the late notice defense did not present a genuine issue of material fact and was properly decided as a matter of law.

■ Contrary to ICG's assertion, there was no fact issue about whether USEPA's February 1986 letter advised Joanna/ICG of the fact that contamination had taken place; whether the letter advised Joanna/ICG that USEPA considered it to be a PRP; and whether USEPA had threatened Joanna/ICG with liability under CERCLA if Joanna/ICG did not undertake the investigation and cleanup of the site. These facts are clear from the face of the letter, and in fact were admitted by ICG in its complaint, as discussed above. That the February 1986 letter gave Joanna/ICG notice of an occurrence and that a claim may be asserted against it is undisputed. Such a circumstance, as discussed above, gives rise to a duty to give notice under the insurance contracts at issue. Similarly, as discussed above, it is undisputed that Joanna/ICG failed to give that notice for at least 14 months.

For these reasons, there was no disputed issue of material fact

regarding Joanna/ICG's having been notified of an occurrence which might lead to the assertion of a claim in February 1986. The circuit court thus properly entered summary judgment in favor of the Insurers because ICG had breached the condition precedent of the contracts of insurance that it provide timely notice of such an occurrence to the Insurers. We affirm that judgment.

## III

ICG finally asserts that the circuit court erred in denying its motions to compel the Insurers to respond to requests for information relating to the notice and estoppel issues on which the court ultimately decided the case. It argues that the circuit court erroneously believed that a deponent had answered questions which he had in fact refused to answer in the first instance, and in the second instance it erroneously believed the motion was untimely despite the fact that it was brought within the designated discovery period and after the required conferences with opposing counsel. ICG asserts that the evidence sought would have or could have substantially affected the circuit court's resolution of the case and that, therefore, these errors must be reversed as an abuse of discretion.

The Insurers respond that the discovery sought was either complied with by the Insurers or was irrelevant to the late notice issue and that, therefore, the denial of the motions had no conceivable impact on the court's summary judgment ruling.

Control of the discovery process is vested in the discretion of the circuit court. (*Wilson v. Norfolk & Western Ry. Co.* (1982), 109 Ill. App. 3d 79, 84, 440 N.E.2d 238, 244.) This discretion should be exercised by keeping in mind the goal of promotion of the ascertainment of truth. (*In re Marriage of Falstad* (1987), 152 Ill. App. 3d 648, 653, 504 N.E.2d 908, 912.) The appellate court can modify orders made concerning discovery upon an affirmative showing of abuse of discretion. (*Wilson*, 109 Ill. App. 3d at 94, 440 N.E.2d at 244.) An abuse of discretion exists if the ruling prevents the ascertainment of truth or substantially affects a crucial issue in the case. *United Nuclear Corp. v. Energy Conversion Devices, Inc.* (1982), 110 Ill. App. 3d 88, 105, 441 N.E.2d 1163, 1174.

On July 8, 1993, ICG deposed Edward C. Albanese of CUICO for over eight hours. On August 26, 1993, ICG filed a motion to compel Albanese to answer certain questions. The vast majority of the motion to compel dealt with the questions for which a privilege objection had been raised. The circuit court denied the motion to compel as to the privileged communications, stating that Albanese did not have to testify as to any such communications, but rather would only

have to disclose facts. As to the remaining questions, the court found that Albanese had answered them.

■ Counsel for ICG stated on the record that all of his questions regarding the issue of late notice had been answered. The deposition transcript contains the following statement:

> "[Counsel for ICG]: In this case, Mr. Berdelle just read you one answer that has to do with his late notice defense, and if his case is limited to that single defense, then I don't have any problem. I think the witness has answered all my questions."

Although CUICO's case was not limited to that single defense, as it turned out that issue was dispositive. ICG's own counsel stated on the record that Albanese had answered all of his questions regarding the only important issue in the case. The circuit court did not abuse its discretion in denying the first motion to compel.

ICG filed its second motion to compel discovery, this time against AMICO and Lumbermen's, on December 29, 1993. A hearing on the motion was held on January 4, 1994, one day before the third discovery cut-off date set by the court. The case was more than 2¹/₂ years old at the time, and discovery had been open for nearly all of that time. The court informed ICG that it was concerned with moving its docket and with bringing this particular case to a conclusion. The motion concerned certain document requests to which AMICO and Lumbermen's had objected on November 10, 1992—more than 13 months before ICG filed its motion to compel. ICG claims that its motion sought compliance with a second, later document request, but that request sought the same type of documents and the same issues.

The law in Illinois recognizes that a circuit court not only has wide discretion in controlling the course of discovery, but also to enter appropriate orders to enforce the requirement that a party act with diligence in pursuing discovery and moving a case to a conclusion. (See, e.g., Evers v. Edward Hospital Association (1993), 247 Ill. App. 3d 717, 617 N.E.2d 1211, appeal denied (1993), 153 Ill. 2d 559, 624 N.E.2d 806; Continental Illinois National Bank & Trust Co. v. Eastern Illinois Water Co. (1975), 31 Ill. App. 3d 148, 334 N.E.2d 96.) ICG simply displayed a lack of diligence, despite repeated warnings from the court that it wanted and expected the parties to move the case forward and get their summary judgment motions on file. The circuit court's ruling in this case was therefore not an abuse of discretion.

Further, ICG sought production of documents interpreting the pollution exclusion in the AMICO policies, documents exchanged with the insurance services office about forms which that office wrote and made available to various insurance companies, and documents

showing what forms AMICO and Lumbermen's used in the 1960s and 1970s. These requests, however, dealt exclusively with two issues which the circuit court did not decide and which are irrelevant to the issue raised in this appeal. Neither of these issues had anything to do with the late notice issue, which was the sole issue ruled upon in deciding the summary judgment motions. Consequently, the denial of the second motion to compel, insofar as it sought to compel production of these documents, had no impact on how the circuit court decided the summary judgment motions. As ICG admits, a ruling on a discovery motion will not be disturbed on appeal unless it affected the disposition of a crucial issue in the case.

ICG also complains that the circuit court should have compelled two AMICO witnesses to answer questions asked at their depositions. The first of these witnesses was asked a question that had nothing to do with the late notice issue, but the second was asked questions directly related to that issue. This witness, however, answered these questions fully at various points in his deposition. ICG therefore obtained all requested discovery dealing with the late notice issue. The circuit court therefore did not abuse its discretion in denying ICG's second motion to compel discovery.

Because the circuit court did not abuse its discretion in denying ICG's two motions to compel discovery, we affirm the circuit court on the discovery issues as well.

Affirmed.

SCARIANO, P.J., and HARTMAN, J., concur.